May it please the court, my name is A.J. Beadle from Quinn Emanuel, Urquhart, Oliver & Hedges, counsel for the petitioner, Arturo Mendoza-Carrillo. At this time I'd like to reserve two minutes for rebuttal. Just watch the clock, counsel. Thank you, Your Honor. Mr. Mendoza-Carrillo did not receive a full and fair hearing in front of the immigration judge, and as a result, his due process rights were violated. This court reviews due process violations under a de novo review. This is a stark contrast between the two parties' briefs. You're talking about the refusal to hear witnesses? Yes, Your Honor. The government's brief states that this is an abuse of discretion review, although they cite the two cases which are criminal cases where this court reviewed the entry of evidence under the federal rules of evidence. Here, the issue before the court is whether there was a due process violation, which this court takes under a de novo review. What's the relevance of what these witnesses might have said? They had no knowledge of the original departure of this petitioner, did they? Well, Your Honor, I believe that one did. That was Mr. Matias, Mr. Mendoza-Carrillo's cousin. And he stated, and again, we don't have a full record because he wasn't allowed to testify, but all we have is – You have a showing. Yes. In the witness list that is at the record page 735, the original witness list that was submitted, Mr. Matias had personal knowledge of the Huehuetenango region of Guatemala and of petitioner's family at the time. And so he did have personal knowledge regarding – Did he know anything at all about when the petitioner supposedly left? We don't know, and what is included in the witness list within the record isn't clear. It just says that he was living in that region and was familiar with his – The atomic bomb in your case is the school certificate that he had in his presence when he was picked up showing that he completed school in Guatemala at age 12 in 1992. That's utterly inconsistent with his testimony that he left when he was 2 years old. Absolutely inconsistent. Now, his explanation is that's a forgery or something like that. I mean, how do we cope with that school certificate that completely impeaches his case? Well, Your Honor, I think the school certificate's relevance, especially considering the due process violation, is that you're right in that there's a huge discrepancy there between – Absolutely monstrous. Huge. Yeah, between – He says he left when he was 2. He has a school certificate saying he's completing school in Guatemala at age 12. How about utter contradiction instead of huge discrepancy? How do we deal with that? Well, I think, Your Honors, if you look at what Mr. Matias could have stated, he would have supported Mr. Mendoza-Correa's testimony. And like you said, there's a 10-year window there between what my client testified to and what this school certificate appears to state. And so if Mr. Matias could have provided any sort of testimony about where Mr. Mendoza-Correa was during that 10-year period, whether – You know, he says that – this is Mr. Matias – was in Guatemala during that time. Well, if he could testify that, you know, in 1983, 1984, you know, Mendoza-Correa was nowhere in that region – Was there a motion to reopen with an affidavit supported in some way by the witnesses that you're talking about to amplify all of this? There was not, Your Honor. Is there anywhere in the record still? I mean, you're asking us completely to speculate. There's nothing – there's nothing in the record, but I think that if you look at what this Court decided in Colmenar, the petitioner can't produce a record which wasn't allowed to be developed at the immigration judge level. And a petitioner doesn't have to show exactly what evidence would have been presented. The question – No, but if you'd been representing him, you sure would have done that. That's the practice pointer, at least, of this case. I agree, Your Honor. But I think that the question before the Court, based on the standard in Colmenar, is could the witnesses have potentially affected the outcome of the case? And I think, like you pointed out with the school certificate, the immigration judge found a very different timeline between – from that of the testimony of Mr. Mendoza-Correa. And so if any of these witnesses could have given, you know, factual credence to Mr. Mendoza-Correa's testimony in his timeline, then they should have been allowed to at least be heard. Isn't it your obligation to make a showing that any one of the three could have testified that, oh, yes, I was with him in 1982 when I saw him get on the plane from Guatemala? I believe, Your Honor, that the holding in Colmenar doesn't require that level of detail because the issue is an absence of record in this case. But I believe if you do look, again, at the record at page 735, which, again, is just a four-to-five line explanation on what Mr. Matias would have testified to, there is enough there that I believe that we have met our showing that Mr. Matias could have potentially affected the outcome of the case. What do you do with the fact that he told the authorities when he was arrested that his parents were still in Guatemala and that he left on a bus? And he admits that he told them that. Your Honor, those discrepancies actually stem back to when he was first detained by the INS in an interview by an agent. Right. That agent spoke Spanish, which my client does not. It's not his native language. His native language is actually mom. I agree. But doesn't he admit that he told them that? No. I believe that as long as he's had a mom interpreter, he's been consistent in saying that he was confused and that the only thing he understood. The explanation he gave for these irreconcilable stories was that he panicked when he was arrested, not that he couldn't understand people who were talking to him. Actually, I believe that he testified that he did panic, and the only things he understood was that the officer was asking him for papers and what country he was from, but nothing beyond that in their conversation. And this Court's holding in the 2002 case Singh states that inconsistencies based on translation issues are not substantial evidence to support an adverse credibility determination. Now, as I said before, the due process claim stems from these three witnesses. The first is Mr. Matias, which I've discussed, and then there's also the testimony of Ms. Sykes, a social worker, and Professor Urizar, who would have corroborated Mr. Mendoza-Carrillo's testimony about his past persecution suffered in Guatemala based on his nationality. And the standard in Colmenar is clear, is that did he have a reasonable opportunity to present his case, and were the evidence that was not submitted, could that have potentially affected the outcome of this case? To both questions, I believe the answer is yes. At this time, I'd like to reserve the rest of my time. Roberts. You may do so, counsel. We'll hear from the government. May it please the Court. My name is Charles Riley, representing the United States. The record demonstrates that the appellant was afforded a full and fair hearing on his claims, and the record evidence provides substantial evidence in support of the finding that the appellant was not credible with respect to the education certificate which was admitted into evidence and which the appellant in his own testimony verified or corroborated. You'll recall in his testimony he stated that he first saw that certificate when he was 12 years of age, when supposedly his uncle pulled out his birth certificate. Do you think the edge has an obligation to hear all the evidence that the Petitioner wants to present before making that credibility determination? No, Your Honor. A due process is not required. No, I mean, you're at a hearing. It's like if I was a trial judge. Is it fair for me to say, well, I don't think this witness is credible, therefore you're going to lose, and so I'm not going to let you call any of your witnesses who you're through. The trial judge had every reason to rely upon trial counsel's representation that the only competent witnesses who could verify the Petitioner's allegations or testimony were his aunt and uncle. He said that in a motion for continuance and made it very clear that they were the only competent witnesses. When presented with the proffer with respect to the cousin, the only evidence presented was that he could talk about the events in 1980, but not specifically about what occurred to the family of the Petitioner. Why wouldn't you just let him testify? In the ideal world, Your Honor, perhaps that is a ---- Well, it's supposed to be a fair hearing, right? This was a fair hearing, Your Honor, and he was provided every opportunity to prevent competent witnesses who would be relevant to his testimony. And his own counsel specified that those wouldn't involve his aunt and uncle, who were supposedly in Mexico. And on two occasions, the Petitioner said that he had spoken to his aunt and uncle, first when he spoke to the Mr. Sykes in October of 2001, and that the aunt and uncle were leaving the refugee camp in Mexico the month earlier. At his testimony in 2004, he again gives the same story, that he had spoken to his aunt and uncle the month earlier, that is, in December of 2003, and they were leaving the refugee camp. His testimony is just not believable as it respects to any relevant ---- any relevant witnesses he could produce. The statements made by the Petitioner to the arresting officers, the immigration officers, completely contradicts his own testimony at trial. And also the conditions that he described in the refugee camp in Mexico are completely inconsistent. He says he was there for 15 years, and during that time, refugee camps which were supervised by the High Commission for Refugees and the Mexican government, 22,000 Guatemalans were repatriated to Guatemala. Others were given status in Mexico to stay. And he's unaware of any of this, according to his own testimony. He said he kept to himself. The proffered witnesses would not have affected substantial evidence supporting the immigration judge's adverse credibility determination. As I've mentioned, Ms. Sykes, of course, has no information regarding the incidences in the ---- Sotomayor, at what point did the I.J. make his adverse ---- make the adverse credibility finding? After hearing all the testimony and after obtaining a proffer with respect to the conditions that he witnessed in the early 1980s. And I can't recall. At that point, did the I.J. say, well, I don't think the Petitioner is credible? She then reserves time and issued an opinion rather quickly soon afterwards after hearing all the testimony, as the record would reflect. And her decision is very thorough and specific regarding the evidence that she depended upon in finding that there was adverse credibility problems with this Petitioner. And those are those who I have noted and have been noted with regard to the education certificate, the country conditions, and his statement to the arresting officers. The I.J. provided a fair opportunity for Petitioner to present his claims. She did not have any predisposition regarding Petitioner's claims. Prior to the start of the hearing, her statement according to Petitioner's counsel was that she had an earache and that counsel would have to speak up. Hardly any kind of predisposition to not hear evidence. She stated that she afforded any – the statement does not afford any basis regarding her predisposition, nor did the statement at the time that may be available to hear testimony in any way show any prejudice or predisposition regarding the Petitioner's claims. Nothing that any of these witnesses could have offered would have rehabilitated the lack of credibility arising from Petitioner's testimony. And according to the standards regarding these adverse credibility findings, this Court would have to be compelled to find that the finding was wrong. In fact, the evidence clearly supports the I.J.'s decision. Thank you very much. Thank you, counsel. Mr. Bidell, you have some reserved time. May it please the Court. It's not Petitioner's position that an I.J. has to hear every single witness that would be proffered and have an endless train of witnesses and have no power to stop. But when you don't allow a single corroborating witness to support the story and the determination is ultimately an adverse credibility finding, that is a violation of due process rights. What part of the story was going to be supported by that witness's testimony? Well, I mean, again, as I pointed out before, it's a bit of speculation just because of all we have to go by in the record is what was said in that witness list. But Mr. Matias was present in Guatemala at the time, was familiar with the family. It said in the witness list he was very close with Mr. Mendoza-Creo's father. So Mr. Matias would have had personal knowledge of that region and specifically that village. Who prepared that statement? It was counsel for Mr. Mendoza-Creo at the immigration court. I mean, don't you think that there would have been something in there that would have been salient with respect to this case other than just generalized, I knew the family and I was there? Well, Your Honor, I think actually if you look at these descriptions in the witness list, they're all pretty generic and general. So I think that it was the way the world works. You make your offer of proof and then the judges, as you say, they have discretion not to have to listen to people who can't add very much. Well, the only question that the judge asked regarding Mr. Matias' testimony is would he have personal knowledge of Mr. Mendoza-Creo's time in this Mexican refugee camp? Well, it's certainly relevant, is it not? Well, it's relevant in that it was part of the story. I don't know if it's substantial evidence that would go to an adverse credibility finding because I don't believe it goes to the heart of the asylum claim. But I think that there was a number of other topics which Mr. Matias could have testified to. The witness list says that he was prepared to testify to, including personal knowledge of the time in Guatemala. And so this is not unnecessary or duplicative. It was — Do you know if the local — I forget which immigration court this was. Was it here in San Francisco? Yes, it was, Your Honor. Do they have rules about witness statements and what needs to be included in a witness list or a witness's proposed testimony? Or did he just submit this just kind of — I believe that the submission of the witness list — I'm sorry. I believe — Is there a rule that governs witness lists? I am not aware right now of such a rule either way. I see no time. Thank you. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Paez